Filed 6/3/21  Mattson v. Feeding America Riverside San Bernardino Counties CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| CAROLYN MATTSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FEEDING AMERICA RIVERSIDE<br>SAN BERNARDINO COUNTIES, INC.,<br><br>    Defendant and Respondent. | E073866<br><br>(Super.Ct.No. RIC1803828)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Chad W. Firetag, Judge.

Affirmed.

Law Offices of Robert G. Johnson, Jr., and Robert G. Johnson, Jr., for Plaintiff

and Appellant.

Procter, Shyer & Winter, Lisa N. Shyer and Veronica S. Webb for Defendant and

Respondent.

1

# I.  INTRODUCTION

In December 2015, Carolyn Mattson (plaintiff) incurred a work-related injury that left her unable to perform the normal duties of her regular employment.  During her period of recovery, plaintiff was assigned by her employer to work as a volunteer at a food bank warehouse operated by Feeding America Riverside San Bernardino Counties, Inc. (defendant) as part of a transitional work program.  While there, plaintiff incurred a second injury when she tripped over a wooden pallet on the floor of defendant's warehouse.

On February 23, 2018, plaintiff filed a complaint against defendant that sought compensation for her injury based upon the theories of negligence and premises liability.  The trial court granted summary judgment in favor of defendant based upon the affirmative defense of waiver due to a release executed by plaintiff prior to beginning her work with defendant.  Plaintiff appeals arguing:  (1) the trial court erred by failing to hold the subject release unenforceable as a matter of public policy pursuant to Civil Code section 1668 and *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92 (*Tunkl*), and (2) the trial court erred when it concluded there was no dispute of fact regarding whether defendant's acts or omissions could constitute gross negligence precluding enforcement of the release.  Upon our independent review, we conclude that plaintiff failed to meet her burden to show a dispute of material fact precluding summary judgment and affirm the judgment.

## II. FACTS AND PROCEDURAL HISTORY

### A. *Facts and Procedural History*

In December 2015, plaintiff incurred a work-related injury that rendered her unable to perform the normal duties required by her regular employment. Plaintiff's employer provided her the opportunity to continue to receive a wage in exchange for volunteer work during her period of recovery. Her employer utilized a third party agency to locate a volunteer opportunity, and plaintiff was eventually assigned to volunteer at defendant's food bank.

On February 24, 2016, plaintiff suffered a second injury while at defendant's food bank. While she attempted to feed pieces of cardboard into a baler, plaintiff stepped backward and tripped over an empty wooden pallet that had been placed behind her.

On February 23, 2018, plaintiff filed a civil complaint against defendant seeking compensation for her second injury. Plaintiff alleged that placement of the pallet constituted a dangerous condition and, on that basis, asserted causes of action for negligence and premises liability.

On June 28, 2018, defendant filed an amended answer to the complaint. Among other things, defendant alleged as an affirmative defense that prior to participating in any activities with defendant, plaintiff had executed a written agreement entitled, "Waiver and Release of Liability," which voluntarily released defendant from liability for any future personal injuries arising from defendant's negligence.

On April 24, 2019, defendant filed a motion for summary judgment. Defendant moved for summary judgment on the basis of two affirmative defenses: (1) plaintiff's

3

claims were barred by the release agreement, and (2) plaintiff's claims were barred by the doctrine of workers' compensation exclusivity because defendant was her special employer.[1]

B. *Defendant's Evidence in Support of Summary Judgment*[2]

    1. Declaration of Danisha Lugo

In support of its motion, defendant submitted the declaration of Danisha Lugo. She worked for defendant as an administrative assistant and acted as defendant's volunteer coordinator at the time of plaintiff's incident. Defendant is a nonprofit food bank for communities in Riverside and San Bernardino counties that partially relies on volunteers in order to maintain its operations. During the relevant time period, defendant

---

[1] The trial court denied summary judgment with respect to the workers' compensation exclusivity defense; defendant did not file a cross-appeal claiming error with respect to this issue; and neither party has briefed that issue on appeal. Although our review of a summary judgment is de novo, we limit our consideration to issues adequately briefed on appeal. (*Schmidt v. Bank of America*, *N.A.* (2014) 223 Cal.App.4th 1489, 1511.) Thus, we consider any potential error with respect to the trial court's denial of summary judgment on that ground to be waived for failure to raise the issue on appeal and decline to address it here. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538 [failure to brief an issue on appeal constitutes waiver].)

[2] Because we deem the separate defense of workers' compensation exclusivity waived on appeal, we summarize only the evidence cited by the parties in their respective separate statements pertaining to the issue of waiver. (*San Diego Watercrafts*, *Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315 ["[I]n ruling on a motion for summary judgment, a trial court must consider all the evidence submitted, except the court may ignore evidence not disclosed in moving party's separate statement of undisputed facts."]; *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 492-493 ["Each party . . . must supply a 'reference to the supporting evidence' in its separate statement," and " ' "[d]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues." ' "].)

also provided volunteer opportunities to injured workers as part of a transitional work program. The program involved placement of injured workers who required modified duties in volunteer opportunities in exchange for payment of a regular wage by the worker's regular employer. Defendant provided volunteer opportunities to approximately 50 modified workers annually through this program. Defendant treated modified workers as volunteers; accepted modified workers at the request of third party staffing agencies; had no contractual agreements with any staffing agencies or employers regarding placement of modified workers; did not provide any payment or benefits to modified workers; and did not determine the length of time any modified worker would be placed with defendant.

Ms. Lugo also explained that each modified worker was provided with an orientation on his or her first day at defendant's food bank. The orientation included addressing any restrictions specific to the worker, basic rules related to working in defendant's facilities, and paperwork that included an application and a waiver. She attached, to her declaration, a copy of a document entitled, "Waiver and Release of Liability," and explained that such document was provided to all volunteers and modified workers during orientation. She also attached a copy of the same document bearing plaintiff's name and signature.

Finally, Ms. Lugo explained that modified workers would report directly to one of defendant's food bank operation locations on the days they were assigned to volunteer; defendant would supervise all modified workers by directing their day-to-day duties and

5

assigning them basic tasks; and defendant provided whatever equipment, instruments, or tools necessary to perform any tasks assigned to modified workers.

2. Deposition Testimony of Plaintiff

Defendant also submitted excerpts from plaintiff's deposition testimony. Plaintiff testified that in December 2015, she was involved in a slip-and-fall accident and, as a result, she was placed in a transitional work program due to her injury.

Plaintiff also testified she was not provided any training when reporting to defendant's facility, but she recalled an introductory meeting with someone in defendant's office. She was given a packet of documents to review and sign prior to beginning work at defendant's food bank. When shown the document entitled, "Waiver and Release of Liability," bearing her signature, plaintiff acknowledged that her handwriting and signature appeared on the document, but she stated she did not recall reading the document prior to signing it.

Plaintiff testified that, generally, she was assigned tasks such as sorting food, stacking crates, filling orders, and disposing of things while at defendant's food bank. However, on the date of the incident, someone assigned her to perform work involving a cardboard baler. While plaintiff was struggling to feed a large box into the cardboard baler, she stepped backward and tripped over a pallet that had been placed behind her.

3. Copy of "Waiver and Release of Liability"

Defendant submitted a copy of the executed document entitled, "Waiver and Release of Liability," attached to plaintiff's deposition transcript. The document states in pertinent part: "In connection with my voluntary involvement in activities undertaken

6

for, and/or with the participation and support of [defendant], I . . . hereby agree . . . to release and discharge [defendant and its agents] . . . from all claims, demands, and actions from injuries sustained to my person . . . as a result of my involvement in such activities, whether or not resulting from negligence. I agree to release and hold [defendant] harmless from any cause or action, claims or suit arising there from. . . ."

C. *Plaintiff's Evidence in Opposition to Summary Judgment*

1. Deposition Testimony of Danisha Lugo

In opposition to summary judgment, plaintiff submitted excerpts from the transcript of Danisha Lugo's deposition testimony. At the time of the deposition, Ms. Lugo opined that defendant provided an important public service to those who rely on its services. She also explained that defendant did not distinguish between modified workers or volunteers; both are typically only assigned to work on sorting donated food products inside the food bank; and volunteers are sent directly to defendant's sorting department after checking in for work.

She testified that defendant did not assign volunteers or modified workers to work on equipment in defendant's warehouse, and she was surprised to learn that plaintiff had been asked to use a cardboard baler. If she had known plaintiff was using a cardboard baler at the time, she would have confronted plaintiff and told her to stop. Finally, Ms. Lugo testified that it was a violation of defendant's own policies to allow plaintiff to use the cardboard baler without training.

2. Deposition Testimony of John Crook

Plaintiff also submitted excerpts from the transcript of John Crooks's deposition testimony. Mr. Crooks stated he is the person most knowledgeable about defendant's warehouse safety operations and employee handbook. He explained that volunteers are supervised directly by defendant's employees; defendant's food bank warehouse was an approximately 8,000 square foot area; normally, volunteers would be engaged in sorting food items; and defendant's employees would be responsible for operating equipment. Mr. Crooks implied that allowing plaintiff to operate a cardboard baler would be a violation of defendant's own policies, but he also opined that he would not consider the act of feeding cardboard into the baler operation of the machine.

3. Declaration of Myrna Cruz

Plaintiff submitted the declaration of Myrna Cruz, who declared she was the compliance manager for defendant's operations at the time of plaintiff's incident. Her duties included ensuring workplace safety and training, conducting intermittent safety inspections, preparing incident reports, and ensuring corrective action following workplace injury. During this time, defendant did not provide any formal training regarding workplace safety to modified workers, and modified workers were not authorized to use any equipment, including cardboard balers. Ms. Cruz opined that based upon defendant's policies for modified workers, plaintiff should never have been working with a cardboard baler. She further stated that defendant had an internal policy for placement of pallets; one of the purposes of that policy was to ensure workplace safety; and the placement of the pallet in plaintiff's work area violated this policy.

8

## 4.  Expert Declaration in Opposition

Finally, plaintiff submitted the declaration of an expert who declared that he had an educational background in civil engineering; he worked as a senior forensic engineer for a construction consulting, engineering, safety and management firm; and he had extensive experience in investigating and analyzing accident investigations.

The expert opined that the placement of a pallet near the location plaintiff was working at the time of the incident created an unsafe condition.  Specifically, the expert explained that the use of untrained workers "led to the placement of a pallet within the working area of the cardboard baler and, as such, presented a substantial fall hazard for persons such as [plaintiff]."  He further opined that "[a] pallet constitutes a low-lying trip hazard and would have been difficult for [plaintiff] to perceive at the time of her incident" because pallets "go easily unnoticed and would have been particularly difficult to acknowledge by someone such as [plaintiff] who was preoccupied with job duties." According to the expert, "[t]he pallet was placed in a reasonably foreseeable path of travel and created an obstructed walkway/work area for [plaintiff]. . . ."

The expert believed that placement of the pallet in plaintiff's work area violated various regulations pertaining to workplace safety, various industry standards for workplace safety, and defendant's own workplace safety policies.  Had the pallet not been placed on the floor near plaintiff's work area, plaintiff's injury would most likely not have occurred.

9

D. *Trial Court's Ruling, Order, and Judgment*

On July 11, 2019, the trial court issued a tentative ruling on defendant's motion for summary judgment, concluding that (1) defendant failed to meet its burden to show that plaintiff's claims were barred by the doctrine of workers' compensation exclusivity; (2) defendant's release did not constitute a violation of public policy within the meaning of *Tunkl*; and (3) plaintiff failed to produce evidence sufficient to create a triable issue of material fact regarding whether defendant's acts or omissions rose to the level of gross negligence to preclude enforcement of the release. On July 26, 2019, the trial court entered an order granting summary judgment pursuant to its tentative ruling, as well as judgment in favor of defendant.

## III. DISCUSSION

A. *General Legal Principles and Standard of Review*

Plaintiff appeals from a judgment following the trial court's grant of summary judgment in favor of defendant. "The standard of review for an order granting a motion for summary judgment is de novo. [Citation.] [¶] In performing our independent review, we apply the same three-step process as the trial court. 'Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought.' [Citation.] [¶] 'We then examine the moving party's motion, including the evidence offered in support of the motion.' [Citation.] A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete

defense to that cause of action.  [Citation.]  [¶]  . . .  [I]f the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact."  (*Ryan v. Real Estate of Pacific*, *Inc*. (2019) 32 Cal.App.5th 637, 642.)

B.  *Issues Framed by the Pleadings*

Plaintiff's complaint alleged causes of action for premises liability and negligence arising out of her accident in defendant's warehouse.  In its answer, defendant asserted that prior to her injury, plaintiff executed a written "Waiver and Release of Liability" that operated to release defendant from liability for any injury resulting from negligence.  Defendant moved for summary judgment on this ground.

"The elements of a cause of action for premises liability are the same as those for negligence:  duty, breach, causation, and damages."  (*Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998.)  "Both are negligence claims."  (*Leyva v. Garcia* (2018) 20 Cal.App.5th 1095, 1103; see *McIntyre v. The Colonies-Pacific*, *LLC* (2014) 228 Cal.App.4th 664, 668 [Premises liability is "a species of negligence."].)

"An exculpatory contract releasing a party from liability for future ordinary negligence is valid unless it is prohibited by statute or impairs the public interest. [Citation.]  . . .  A valid release precludes liability for risks of injury within the scope of the release."  (*Grebing v. 24 Hour Fitness USA*, *Inc.* (2015) 234 Cal.App.4th 631, 637 (*Grebing*).)  " ' *"The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence*." ' "  (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 719.)

11

However, a release of liability for future ordinary negligence may be invalidated when "the court determines that a particular release concerns a service that transcends a purely private agreement and affects the public interest." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 757.) Additionally, "[a] release of liability for future gross negligence . . . generally is unenforceable as a matter of public policy." (*Grebing*, *supra*, 234 Cal.App.4th at p. 637.)

Thus, in conducting our independent review, we consider whether defendant met its initial burden to produce evidence establishing the elements of a valid defense based upon the release and whether plaintiff produced evidence to establish a material dispute of fact precluding the application of such defense at the summary judgment stage of proceedings.

C. *Defendant Met Its Initial Burden in Moving for Summary Judgment*

Generally, " ' "[a] defendant moving for summary judgment based upon the assertion of an affirmative defense '. . . has the initial burden to show that undisputed facts support each element of the affirmative defense' . . . . If the defendant does not meet this burden, the motion must be denied." [Citations.]' '[T]he burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense after the defendant meets the burden of establishing all the elements of the affirmative defense.' " (*Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 400.) In the context of the defense based upon a release, "if a complaint alleges facts demonstrating gross negligence in anticipation of a release, the initial burden remains on the moving defendant asserting the release as a defense to produce evidence refuting the allegations

constituting gross negligence." (*Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 880 (*Anderson*).)  However, if the complaint is silent on the issue of gross negligence as a bar to the defense of release, the defendant's initial burden is met by establishing the existence of a release, and plaintiff's execution of the release and the burden to produce evidence showing gross negligence is on the plaintiff opposing summary judgment.  (*Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 32-33 (*Hass*).)

Here, the complaint does not include allegations of the existence of a release or gross negligence in anticipation of negating a defense based upon a release.  Thus, defendant was not required to negate any claim of gross negligence in order to meet its initial burden on summary judgment.  Instead, defendant was only required to establish the existence of a release and plaintiff's execution of it.

The evidence presented by defendant included a copy of a document entitled, "Waiver and Release of Liability," bearing plaintiff's signature.  The document expressly purports to release defendant from personal injuries incurred as a result of plaintiff's involvement in activities with defendant, "whether or not resulting from negligence." Defendant further provided the declaration of its volunteer coordinator, stating that all workers are provided a copy of the document and are asked to review, execute, and return the document prior to the workers' first shifts at defendant's food bank.  Finally, defendant provided excerpts from plaintiff's deposition testimony, wherein plaintiff confirmed the executed document bore her handwriting and her signature.

This evidence was more than sufficient to meet defendant's initial burden to show the existence of a release and plaintiff's execution of it. Accordingly, defendant met its initial burden in moving for summary judgment, and the burden shifted to plaintiff to produce evidence of a triable issue of material fact precluding summary judgment.

D. *Plaintiff's Evidence Was Not Sufficient To Create a Triable Issue of Material Fact in Opposition*

In opposition to summary judgment and on appeal, plaintiff argues summary judgment should not have been granted because: (1) the release is per se unenforceable because it involved an agreement that affects the public interest as defined under *Tunkl*, and (2) she produced sufficient evidence in opposition to show a triable dispute of fact regarding whether defendant's conduct amounted to gross negligence, requiring a jury to determine whether the release would be enforceable under the circumstances. We do not believe the release in this case affects the public interest under *Tunkl*, but we conclude that plaintiff's evidence was not sufficient to create a dispute of material fact on the issue of gross negligence.

1. The Release Does Not Violate Public Policy Within the Meaning of *Tunkl*

On appeal, plaintiff argues the factors set forth in *Tunkl* weigh in favor of finding defendant's release affects the public interest, such that a release of future liability for negligence should be unenforceable as against public policy. We disagree.

In *Tunkl*, *supra*, 60 Cal.2d 92, our Supreme Court considered the validity of a release required by a nonprofit research hospital as a condition of providing medical treatment to patients. (*Id.* at p. 94.) In that context, our Supreme Court held that

14

contractual provisions exculpating a party from liability are invalid under Civil Code section 1668[3] if the contract "affects the public interest." (*Id.* at pp. 96, 98.)

In *Tunkl*, our high court set forth six factors used to determine if a contract affects the public interest: " ' "[1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." ' " (*Hass*, *supra*, 26 Cal.App.5th at p. 29.) While "[n]ot all of these factors need to be present for an exculpatory contract to be voided as affecting the public interest" (*ibid.*), we conclude that none of the factors have been satisfied in this case.

---

[3] Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

First, plaintiff contends defendant operated a business of the type generally thought suitable for public regulation because it was required to register as a nonprofit organization with taxing authorities; required to register as a nonprofit corporation with the California Secretary of State; and required to comply with general workplace safety regulations. However, almost every business of any kind is required to register with taxing authorities, obtain a business license to operate, and comply with general workplace safety regulations with respect to its employees. If this were sufficient to establish the first *Tunkl* factor, then every business would be considered "suitable for public regulation," rendering this factor meaningless.

Instead, "[t]he 'public regulations' factor is intended to focus the court's attention on the question of whether the exculpatory clause will adversely affect a public interest demonstrated by the presence of regulations." (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 28.) Here, the evidence in the record indicates that the waiver and release document was provided only to volunteers and modified workers. Such a release does not adversely impact any public interest that general taxing or licensing regulations are intended to protect. Nor does it impair the enforceability of workplace safety regulations, as defendant is still required to comply with any such regulations for the safety of its actual employees.[4] Plaintiff did not produce any evidence

---

[4] The purpose of workplace safety regulations is to ensure the safety of employees, not necessarily to ensure the general safety of all persons. (*SeaBright Ins. Co. v. US Airways*, *Inc.* (2011) 52 Cal.4th 590, 597 [The California Supreme Court has "*never held under the present law* that a specific Cal-OSHA requirement creates a duty of care to a party that is not the defendant's own employee."].)

16

to suggest that acceptance of volunteers to perform charitable nonprofit work is subject to any particularly heightened form of regulation and has not identified any regulation that would be invalidated or impaired by the release in this case. Accordingly, the first *Tunkl* factor is not satisfied.

Second, plaintiff contends that defendant provides a service of great importance to the public because of the essential nature of its food distribution services. However, nothing in the record suggests plaintiff was a recipient of defendant's food bank services. More importantly, the release in question is part of the agreement between defendant and volunteers or modified workers within defendant's warehouse—not between defendant and those seeking to obtain food from defendant's food banks. The evidence in this case is that defendant did not treat modified workers differently than volunteers; defendant did not provide any benefits or payment to modified workers; and defendant actually discontinued its modified worker program sometime after plaintiff's injury. Thus, while we agree that the provision of food to those in need can be considered essential and of great importance, the release at issue here did not pertain to the provision of this service, and the second *Tunkl* factor has not been satisfied.

Finally, the evidence in the record is that defendant accepted only about 50 modified workers annually at the request of third party staffing agencies. Defendant did not offer any benefits or payment to these modified workers; modified workers were paid by their regular employer; the amount of time a modified worker would be assigned to work as a volunteer was determined by the modified worker's regular employer; and defendant had no contractual relationships with the modified worker's regular employer

or the staffing agencies seeking to place modified workers in volunteering opportunities. Thus, with respect to the service defendant was actually providing to plaintiff—a volunteer opportunity as part of a transitional work program—it cannot be said that this service was generally open to any member of the public within the meaning of the third *Tunkl* factor. Nor does this support the conclusion that defendant held any "decisive bargaining advantage," "superior bargaining power," or "control" over modified workers within the meaning of the fourth, fifth or sixth *Tunkl* factors.

Instead, the evidence suggests that any benefit received by a modified worker was pursuant to the modified worker's contract of employment with his or her regular employer—an agreement separate from the one provided by defendant involving the exculpatory clause at issue.[5] Because we conclude that none of the *Tunkl* factors are present in this case, the trial court did not err when it declined to hold the release per se unenforceable as a matter of public policy.

2. Plaintiff's Evidence Was Not Sufficient To Show a Triable Issue of Fact with Respect to Gross Negligence

Alternatively, plaintiff argues that she produced sufficient evidence in opposition to summary judgment to show a genuine dispute of material fact regarding whether

---

[5] The suggestion that plaintiff was left with no other choice but to work in defendant's warehouse is unpersuasive. Certainly, the opportunity to earn a full wage in exchange for volunteer work within plaintiff's modified work restrictions presented an economic benefit to plaintiff, but such a benefit is clearly not one offered to most employees who suffer workplace injuries generally.

18

defendant's conduct rose to the level of gross negligence, requiring the issue to be resolved by a jury. We disagree.

Generally, gross negligence requires a plaintiff to show " 'either a " ' "want of even scant care" ' " or " ' "an *extreme* departure from the ordinary standard of conduct." ' " [Citations.]' [Citations.] ' " 'Gross negligence' falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. . . ." ' " (*Anderson*, *supra*, 4 Cal.App.5th at p. 881.)

The parties devote significant argument to the issue of whether use of the cardboard baler contributed to plaintiff's incident and whether plaintiff was properly trained in the use of the baler. However, on summary judgment, " 'an issue of fact can only be created by a conflict of evidence' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525) and "[a]rgument of counsel is not evidence." (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173.) Here, the evidence presented regarding plaintiff's use of the baler was simply not sufficient to show a dispute of material fact related to the issue of gross negligence.

Plaintiff's deposition testimony simply stated that she struggled to load cardboard into the baler, stepped back, and tripped. She did not specifically suggest that the use of the baler forced her to step back or explain how the use of the baler contributed to her fall. Nor was there any evidence that the use of a baler could force a person to step back. Further, while plaintiff's expert opined that placement of the pallet in an area where persons would be using a baler created a dangerous risk, he did not opine or explain how operation of the baler contributed to that risk. In fact, the expert suggested that no injury

19

would have occurred absent placement of the pallet. Finally, while there was evidence that plaintiff's use of the baler violated one of defendant's internal policies, there was no explanation provided regarding the purpose of such policy or whether it was intended to address the risks presented in this case. In short, there was simply no evidence from which to infer that anything specific to plaintiff's use of the baler contributed in any meaningful way to her injury. Presumably, she could have tripped over a misplaced pallet after stepping back from performing any activity, and none of the evidence suggested the operation of the baler was relevant to plaintiff's accident.

With respect to the placement of the pallet, plaintiff did produce evidence in the form of an expert opinion that the placement of the wooden pallet created a hazard in violation of various regulations and industry standards,[6] as well as a declaration by defendant's own safety compliance manager stating that placement of the pallet in plaintiff's work area violated defendant's own internal safety policy. However, although the placement on the floor of the pallet created a tripping hazard and evidences negligence, we do not believe such evidence is sufficient to support a finding of gross negligence in the context of this case.

" '[T]he distinction between "ordinary and gross negligence" reflects "a rule of policy" that harsher legal consequences should flow when negligence is aggravated instead of merely ordinary.' " (*Anderson*, *supra*, 4 Cal.App.5th at pp. 878-879.) Cases

---

[6] While defendant objected to various aspects of the expert declaration, the trial court overruled objections to the specific portions of the declaration pertaining to placement of pallets and the opinion that placement of the pallet here violated various safety regulations and industry standards.

20

have recognized that the nature of the activity being performed is highly relevant when defining the duty of care owed by the particular defendant. (*Willhide-Michiulis v. Mammoth Mountain Ski Area*, *LLC* (2018) 25 Cal.App.5th 344, 358 [noting the nature of a sport is highly relevant to define the duty of care in determining gross negligence].) "In assessing where on the spectrum a particular negligent act falls, ' " [t]he amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it." ' " (*Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 32.)

Thus, while some cases recognize that evidence of a defendant's violation of internal safety policies or an established industry standard can be sufficient to allow a jury to infer gross negligence, these cases often involve policies or standards directed to recreational or other activities that present unique risks of harm specific to the underlying activity. (See *Rosencrans v. Dover Images*, *Ltd.* (2011) 192 Cal.App.4th 1072, 1086-1087 [motocross track operator's failure to follow caution flagger policies could support gross negligence]; *Chavez v. 24 Hour Fitness USA*, *Inc.* (2015) 238 Cal.App.4th 632, 641-642 [gym manager's failure to follow policies regarding maintenance on gym equipment could support gross negligence]; *Jimenez v. 24 Hour Fitness USA*, *Inc.* (2015) 237 Cal.App.4th 546, 556-557 [gym operator's failure to follow manufacturer instructions and industry safety standards regarding placement of equipment could support gross negligence].) This makes sense because in the context of a unique activity that presents distinct risks of harm, the existence and violation of a written policy or

standard can be highly relevant to the determination of whether and to what degree the defendant has failed to exercise reasonable care under the circumstances.

In contrast, the risk presented here is a low-lying trip hazard created by the misplacement of a pallet. The risk of tripping over a misplaced object is not unique to any specific activity or setting. It is a risk that is common, such that a person of ordinary prudence can determine the extent of reasonable conduct necessary even in the absence of any written policies or standards. Typically, the placement on the floor of an item that does not belong there does not evidence the type of negligent conduct which may be categorized as aggravated. There is no evidence in the record suggesting that the pallet was placed on the floor where it was situated to deliberately cause plaintiff or anyone else to trip. The fact that a defendant may have formulated a written policy intended to address the risks of trip hazards does not fundamentally transform the underlying nature of the risk or the nature of the alleged negligence in failing to protect against that risk. In the absence of any policy or standard, the mere failure to remedy a trip hazard would clearly constitute only ordinary negligence, and we see no reason why the existence of such a policy or standard suddenly transforms the nature of the underlying negligent act into an extreme departure from the ordinary standard of conduct. Otherwise, every trip-and-fall in violation of a policy would create an inference of gross negligence. Thus, the evidence in this case was simply not sufficient to show a triable issue of material fact on the issue of gross negligence precluding enforcement of the release.

## IV.  DISPOSITION

The judgment is affirmed.  Defendant is to recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

SLOUGH _____
Acting P.J.

RAPHAEL _____
J.